728 P.2d 840

**In the Matter of Walter NAILS, An attorney admitted to practice before the Courts of the State of New Mexico.**

**No. 16610.**

Supreme Court of New Mexico.

Nov. 25, 1986.

Virginia Ferrara, Chief Disciplinary Counsel, Randall Van Vleck, Deputy Disciplinary Counsel, Albuquerque, for Board.

Houston Ross, George Morrison, Albuquerque, for respondent.

## OPINION

**PER CURIAM.**

This matter is before this Court after disciplinary proceedings conducted pursuant to NMSA 1978, Rules Governing Discipline (Repl.Pamp.1985) wherein attorney Walter Nails was found to have committed numerous violations of NMSA 1978, Code of Professional Responsibility (Repl.Pamp. 1985), arising out of an incident unrelated to his practice of law. We adopt the Disciplinary Board's findings and conclusions as well as accept its recommendation that Nails be suspended from the practice of law for a period of at least six (6) months.

In January 1985, Nails shared a law office with another attorney who had a client named Steve Duran. Duran, an automobile mechanic, happened to be present in the office one afternoon when Nails' car refused to start. At Nails' request, Duran towed the vehicle to his shop and performed the necessary repairs. When these were completed, Duran drove to Nails' office and gave him a ride to the shop to get his car. Upon arrival, Nails stated to Duran that he had forgotten his checkbook but would pay Duran the $111.29 for repairs the following day. Although Duran was not in the habit of extending credit, he felt that Nails, as an attorney, was someone who could be trusted so Duran released the car.

For several days, Duran attempted without success to reach Nails and obtain payment. On January 9, 1985, he finally went to Nails' office and waited there until he was given a check by Nails. Duran went directly to the bank where Nails' account was located and attempted to cash the check. He was advised that there were insufficient funds in the account. Bank records and testimony at the hearing indicated that the account was overdrawn by ninety-two cents ($.92) on that date and that Nails had been advised of this problem by the bank. It is obvious that Nails was aware of the situation when he wrote the check to Duran. No funds sufficient to cover the check to Duran were deposited in the account until January 26, 1985.

Duran returned to the bank on at least two subsequent occasions, and each time the check was dishonored. He then called Nails to discuss the problem, but Nails refused to speak with him. On January 14, 1985, Duran went to Nails' office with his brother and personally advised Nails that unless payment was forthcoming he would repossess the automobile pursuant to his rights under NMSA 1978, Section 48–3–1(B). Nails again refused to discuss the matter. Duran and his brother immediately proceeded to prepare the car to be towed, at which point Nails telephoned the police and reported that his car was being stolen. When the police arrived and became apprised of all the facts, Duran was allowed to take the automobile.

Thereafter, Nails made no efforts to pay Duran. In April 1985, Duran hand-delivered to Nails a letter advising him of the mounting storage charges and requesting that he either claim his vehicle by paying the amount owed or transfer title to Duran

so he could sell the car and apply the proceeds to the bill. Nails ignored this letter.

On June 12, 1985, Duran filed a *pro se* action against Nails in Metropolitan Court seeking payment of the bill, which by then, had arisen considerably. Nails answered the allegations, denying that work had been performed by Duran or that money was owed. At a pre-trial conference in September, 1985, Nails represented to Judge Diane del Santo that he would transfer title of the car to Duran so that it could be removed from storage and sold to keep charges from accruing. He also advised the judge that the reason his check to Duran had not been honored by the bank was because he had stopped payment on it.

Nails never did transfer title to Duran, and his statements concerning the check were blatant misrepresentations.. At a trial held in October, 1985, Nails presented no evidence in support of his position, as stated in his Answer. Judgment was entered for Duran in the amount of $1,649.45 plus interest, but has yet to be fully satisfied despite the issuance of three (3) writs of execution.

The matter was referred to the Disciplinary Board by the judge, who enclosed with her letter the taped transcript of the trial as well as copies of the pleadings in the case. Nails was contacted by Disciplinary Counsel on November 6, 1985, and asked to address the problem. Nails requested a copy of the taped transcript and more specific information regarding the nature of the complaint. The tape was provided. Thereafter, Disciplinary Counsel advised Nails more precisely of the judge's concerns and what disciplinary rules could be involved. Nails responded by demanding that the judge personally state her concerns in writing, accused Disciplinary Counsel of substituting her opinion for the complainant's, and insisted that his due process rights were being violated. Disciplinary Counsel wrote two more letters to Nails in which she explained that she was simply conducting an initial investigation pursuant to NMSA 1978, Disc.Brd.P.Rule 8(c) (Repl.Pamp.1985), and requesting that Nails address the allegations against him. Nails did not respond to these letters.

On January 31, 1986, Nails was advised that records pertaining to his checking account for the period of January, 1985, were being subpoenaed. At this point, Nails responded by threatening Sunwest Bank with legal action if the subpoena was honored. He also accused Disciplinary Counsel of being unfit to conduct an investigation and threatened her with legal action if she attempted to "tamper" with his bank records. He, however, filed no motion to quash the subpoena.

Nails' conduct toward Duran, the Court, Sunwest Bank, and Disciplinary Counsel is violative of Code of Prof.Resp.Rules 1–101(C), 1–102(A)(3), 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 7–102(A)(1), 7–105(A) and 7–106(C)(6).

This case raises several issues which we will address separately.

Nails claims that the Disciplinary Board had no authority to investigate any allegations which involved actions occurring outside of the scope of his professional capacity and that this Court may not discipline him for personal conduct not involving his practice of law. Nails overlooks NMSA 1978, Rules Governing Discipline, Rule 10 (Repl.Pamp.1985) (emphasis added), which directs in part that it is the duty of any attorney licensed by this Court "to conduct himself *at all times, both professionally and personally,* in conformity with standards imposed upon members of the bar" and that acts or omissions which violate the Code of Professional Responsibility provide grounds for discipline "whether or not the act occurred in the course of an attorney-client relationship."

■ This is not to say that the Disciplinary Board and this Court will take action against an attorney for an ordinary display of human foibles or act as a collection agency when he or she is delinquent in meeting personal financial obligations. If, however, an attorney engages in fraudulent acts or other conduct prejudicial to the

administration of justice or reflecting adversely upon his or her fitness to practice law, then the attorney can and will be disciplined regardless of the context in which the misconduct occurs. We have taken this position in the past and will continue to do so. *See Matter of Quintana,* 103 N.M. 458, 709 P.2d 180 (1985) (among other violations, threatening a neighbor with criminal prosecution in an argument concerning a boundary separating their property); *In re Norrid,* 100 N.M. 326, 670 P.2d 580 (1983) (failure to file income tax return); *In re Rickard,* 93 N.M. 35, 596 P.2d 248 (1979) (fraudulent filing of insurance claim); and *In re Morris,* 74 N.M. 679, 397 P.2d 475, 17 A.L.R.3d 681 (1964) (involuntary manslaughter resulting from driving while intoxicated).

■ Nails also has asserted the position that his right to due process was violated by the failure of the initial written complaint to state with specificity the precise acts which the complainant deemed violative of the Code of Professional Responsibility. Nowhere is it mandated that a complainant must adhere to any particular formula when filing a complaint with the Disciplinary Board. Obviously, when an attorney is asked to respond to a complaint he or she must be given some idea of the nature of the alleged problem in order to provide any meaningful information with respect to his or her position. The attorney, however, does not need to know what the complainant personally views as a violation of a particular disciplinary rule. To require potential complainants to phrase their allegations with legal precision would be unreasonable and would discourage members of the public from bringing their concerns about an attorney's conduct to the attention of the disciplinary board. Many complaints are by laymen unversed in the law.

■ Furthermore, the complainant is not a real party to any action commenced before the disciplinary board. The purpose of attorney discipline is not to litigate any cause of action that someone may have against an attorney nor to provide personal remedies to complainants. The purpose of attorney discipline is to protect the public and the profession from unscrupulous attorneys. It is disciplinary counsel rather than the complainant who, in the final analysis, must make the determination whether there is probable cause to believe that an attorney's actions might be violative of a particular rule of the Code of Professional Responsibility.

■ In the instant case, the complainant included with her complaint copies of documents from the court file and a copy of the trial transcript, all of which were provided to Nails. Disciplinary Counsel also complied with Nails' demands for more specific information by discussing the matter with the complainant and, thereafter, advising Nails of the particulars of her concerns. Pursuant to NMSA 1978, Disciplinary Board Rules of Procedure, Rule 8(c) Nails had the right to be advised of the general nature of the allegations against him and to be given a reasonable opportunity to respond. He was accorded these rights. Pursuant to Code of Professional Responsibility Rule 1–101(C), Nails had the duty to give his full cooperation and assistance to disciplinary counsel in discharging her duty to investigate the complaint against him. He offered no cooperation or assistance whatever, and charges were filed only after his obdurate refusal to supply any explanation for his actions.

If Nails felt that he had a valid Fifth Amendment privilege, then he could have asserted it. Similarly, if he felt that the subpoena for his bank records had been improvidently issued, then his remedy was to apply to this Court to have the subpoena quashed pursuant to NMSA 1978, Disc.Brd. P.Rule 7(d) (Repl.Pamp.1985). Simply threatening Disciplinary Counsel and criticizing the disciplinary process in general will not relieve an attorney of his or her duty to cooperate during investigations into allegations of misconduct.

■ IT IS THEREFORE ORDERED that Walter Nails be and hereby is suspended from the practice of law for a peri-

od of at least six (6) months pursuant to NMSA 1978 Rules Governing Discipline, Rule 11(a)(2) (Repl.Pamp.1985).

IT IS FURTHER ORDERED that prior to any application for readmission Nails must show proof that he has taken and passed the Multistate Professional Responsibility Examination and paid the costs of this action and fully complied with all of the requirements of NMSA 1978, Rules Governing Discipline, Rule 17 (Repl.Pamp. 1985).

If he has done this prior to the expiration of the six-month period, reinstatement will be automatic in six (6) months; otherwise, he will not be automatically reinstated until such time as he has taken and passed the examination.

IT IS FURTHER ORDERED that the Clerk of the Supreme Court forthwith strike the name of Walter Nails from the roll of those persons permitted to practice law in New Mexico and that this Opinion be published in the *New Mexico Reports* and in the State Bar of New Mexico *News and Views.*

Costs of this proceeding in the amount of $915.45 are assessed against Nails and must be paid to the Disciplinary Board on or before May 1, 1987.

IT IS SO ORDERED.

RIORDAN, C.J., SOSA, Senior Justice, and FEDERICI, STOWERS and WALTERS, JJ., concur.